**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**CASE NO. _____**

| | |
|---|---|
| ANDREW MACKMIN, *et al.*,<br><br>               Plaintiffs,<br><br>       v.<br><br>VISA INC., *et al.*,<br><br>               Defendants. | Action Pending in United States District Court for the District of Columbia<br><br>No. 1:11-cv-01831-RJL |
| MARY STOUMBOS,<br><br>               Plaintiff,<br><br>       v.<br><br>VISA INC., *et al.*,<br><br>               Defendants. | Action Pending in United States District Court for the District of Columbia<br><br>No. 1:11-cv-01882-RJL |
| NATIONAL ATM COUNCIL, INC., *et al.*,<br><br>               Plaintiffs,<br><br>       v.<br><br>VISA INC., et al.,<br><br>               Defendants. | Action Pending in United States District Court for the District of Columbia<br><br>No. 1:11-cv-01803-RJL |

**PLAINTIFFS' MOTION FOR AN ORDER COMPELLING THIRD PARTIES
FIDELITY NATIONAL INFORMATION SERVICES, INC., FIDELITY
INTEGRATED FINANCIAL SOLUTIONS, AND ARMED FORCES FINANCIAL
<u>NETWORK TO PRODUCE DOCUMENTS</u>**

Plaintiffs in the above-captioned antitrust class actions respectfully submit this Motion for an Order compelling third parties Fidelity National Information Services, Inc., Fidelity Integrated Financial Solutions, and Armed Forces Financial Network to produce documents responsive to their subpoenas. Plaintiffs have done everything they could to obtain the documents without motion practice, but the responding parties have not responded with corresponding good faith efforts. Plaintiffs respectfully request that their Motion to Compel be granted in full.

Plaintiffs all allege that restraints adopted by the banks that participate in the Visa and Mastercard networks have inflated the pricing of ATM transactions for both consumers and independent ATM operators. As is well-accepted in antitrust litigation, Plaintiffs intend to demonstrate the economic effect of the challenged restraints with models that estimate the prices that would have prevailed if the restraints had never been implemented—the so-called "but for" world. There is no dispute that these models will be constructed from real-world ATM transaction data.

As discussed further below, the ATM data maintained by Defendants is limited. Accordingly, both Plaintiffs and Defendants Visa and Mastercard have directed subpoenas to the primary third-party ATM processors, including Fidelity National Information Services, Inc. ("FIS"), as well as third-party networks, including Armed Forces Financial Network, LLC ("AFFN") to obtain ATM data these processors and networks maintain.

ATM processors like FIS route ATM transactions to a cardholder's bank over ATM networks, cause funds to be transferred from the cardholder's bank account, and authorize ATMs to dispense cash to the cardholder. In addition to certain categories of documents related to the

operations of processors, Plaintiffs have requested monthly reports showing the cash withdrawals processed by FIS along with various fees —access fees, interchange fees, switch fees, and network fees—assessed on those transactions.   *See* Declaration of Craig Briskin ("Briskin Decl."), Ex. 1 ¶¶ 4, 9.   Plaintiffs intend to use these and other requested data to identify and model the factors that influence ATM pricing.   Because FIS handles large volumes of transactions traveling over a dozen or more ATM networks, it is a particularly comprehensive data source for these purposes.

FIS and its subsidiary, Fidelity Integrated Financial Services ("FIFS"), maintain that they have no documents responsive to Plaintiffs' subpoenas in their possession, custody or control. This position is not credible.   It is contradicted by FIS and FIFS's own public statements, including FIS's website, annual reports, and filings with the Securities and Exchange Commission.   On its website, FIS proclaims that it offers "ATM Driving, Processing, and Monitoring" services.   Despite Plaintiffs' best efforts, FIS and FIFS have refused to explain the discrepancy between their public statements and their subpoena responses.   In fact, it is inconceivable that a publicly traded company worth billions of dollars does not have possession, custody or control over the transaction data that constitute the core of its business – and FIS has failed to provide any information to rebut the presumption that it has control of its own books and records.

FIS further argues that Plaintiffs have not subpoenaed the correct corporate entity within the Fidelity family.   This argument is also meritless. If another company within the FIS family formally has control of these subpoenaed documents, it is FIS's obligation to make that known to Plaintiffs and produce those documents.   FIS's game of "hide the ball" has needlessly increased

the costs associated with the above-captioned litigation in violation of Rules 1 and 45 of the Federal Rules of Civil Procedure.

ATM networks like AFFN provide ATM services to ATM operators throughout the United States and worldwide. AFFN, which is represented by the same counsel as FIS and FIFS, has also refused to provide subpoenaed ATM information on the basis of alleged trade secret and confidentiality concerns. AFFN's position is unsupportable. Plaintiffs are seeking data that are entirely historical and already covered by an existing protective order that limits disclosure of confidential information. As courts throughout the country have held, with such protections in place, AFFN's confidentiality concerns are not a sufficient basis to withhold relevant documents.

Plaintiffs respectfully request an order compelling FIS, FIFS, and AFFN to produce the subpoenaed documents and data.

## BACKGROUND

### A.    Plaintiffs' Antitrust Class Actions

The subpoenas at issue arise from three antitrust class actions that have been coordinated for discovery purposes in the United States District Court for the District of Columbia. The Plaintiffs in *Mackmin, et al. v. Visa, Inc., et al.*, 11-cv-1831 (D.D.C.) (*Mackmin* Plaintiffs) and *Stoumbos v. Visa, Inc., et al.*, 11-cv-1882 (D.D.C.) are consumers who allege they have paid supracompetitive surcharges to access funds at ATMs operated by entities other than their own banking institution.[1] In *National ATM Council, Inc., et al., v. Visa, Inc., et al.*, 11-cv-1803 (D.D.C.), the Plaintiffs are independent ATM operators who allege they have paid

---

[1]   The difference between the two consumer classes is that the *Mackmin* Plaintiffs transacted at bank-operated ATMs and the *Stoumbos* Plaintiffs transacted at ATMs operated by non-banks. In addition, the *Mackmin* Plaintiffs, unlike all other Plaintiffs, have named the largest retail banks as Defendants—specifically, Bank of America, Wells Fargo and Chase.

supracompetitive "network fees" to Visa and Mastercard—for the connectivity these networks provide.[2]

Plaintiffs in all three actions allege that ATM surcharges and network fees have been inflated as a result of an unlawful agreement between the banks belonging to Visa and Mastercard. The Defendants in the three cases, along with other member banks, entered these agreements in the mid-1990s. Through Visa's and Mastercard's operating regulations, the member banks implemented so-called "non-discrimination" rules that bar ATM operators from charging lower ATM fees for transactions routed over competing networks. For example, if an ATM operator imposes a surcharge of $3.00 for transactions routed over Visa or Mastercard, it cannot impose a surcharge of less than $3.00 for transactions routed over any other network, even though competitor networks offer the same service at a more competitive price. Plaintiffs allege that this prohibition has stifled ATM competition, resulting in higher network fees (paid by ATM operators) and higher surcharges (paid by consumers).[3]

**B.     Plaintiffs Seek ATM Transaction Data and Documents to Establish Both Liability and Damages in Their Antitrust Class Actions.**

To obtain class certification, Plaintiffs need to establish that the antitrust impact element of their claims—the injury resulting from the non-discrimination rules—is susceptible to proof with evidence common to their respective classes. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 89 (D.D.C. 2017). Plaintiffs intend to make this showing

---

[2] All Plaintiffs in the above-captioned matters have issued subpoenas to AFFN and FIS. Plaintiffs in the *Mackmin* and *National ATM Council* matters have issued subpoenas to FIFS. *See* Briskin Decl. ¶¶ 6-9.

[3] A more detailed explanation of the scheme can be found in *Osborn v. Visa*, 797 F.3d 1057, 1061-64 (D.C. Cir. 2015), in which the D.C. Circuit concluded that Plaintiffs had Article III standing, and they had adequately alleged an agreement in restraint of trade cognizable under Section 1 of the Sherman Antitrust Act.

with economic models that require robust pricing data for the consumer Plaintiffs and comprehensive network fee data for the independent ATM operators. *See id.* at 56 (explaining that data-driven models predicting but-for prices are a "mainstream tool in economic study" used to "determin[e] damages in antitrust cases").[4]

Plaintiffs have sought ATM data from Defendants, but there are limitations to the data in Defendants' possession, custody and control.   Visa and Mastercard possess data only for transactions processed over their networks; there are at least a dozen other networks.   The Bank Defendants in the *Mackmin* case likewise maintain data only for transactions on their ATMs or by their cardholders.   The classes in these cases, however, are not so limited.   The consumer classes, for example, encompass transactions routed over *all* ATM networks and at ATMs operated by an assortment of third-party banks and non-banks.  *See* Briskin Decl. ¶ 4.

Because no single entity possesses a comprehensive set of ATM data, Plaintiffs must combine multiple sources of party and third-party data to construct models capable of predicting ATM surcharges for the proposed consumer classes they seek to represent, and network fees for the proposed the independent operator class.   To this end, Plaintiffs directed subpoenas to 11 third-party ATM processors and 13 third-party ATM networks.[5]   The information Plaintiffs seek from FIS is particularly important given FIS's role as a processor of ATM transactions, and as a system to record these transactions.   ATM processors such as FIS handle large volumes of

---

[4] *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *11 (E.D. Pa. Oct. 19, 2015) (internal quotation marks omitted) ("A reliable regression depends on data with a reasonable degree of integrity.").

[5] The subpoenaed processors are Elan, First Data, Fidelity National Services, Inc (FIS), Fiserv, Jack Henry & Associates, Vantiv, Columbus Data, EFX, Payment Alliance International, Switch, and Worldpay. Plaintiffs have also directed subpoenas to 13 ATM networks. The subpoenaed networks are NYCE, Accel, Allpoint, Armed Forces Financial Network ("AFFN"), BOKF, Co-Op Financial, Credit Union 24, Jeanie Network, Publix Supermarkets, Pulse, Shazam, Star, and MoneyPass.

transactions traveling over multiple networks.  Similarly, networks like AFFN provide ATM services to ATM Operators throughout the United States and worldwide.[6]  Briskin Decl. ¶ 4. Therefore, its data are a highly important aggregated source of transactions between the many individual ATM operators and banks who participate in the AFFN network. *Id.*

## C.     Despite Extensive Meet-and-Confers, Counsel for FIS and FIFS Refuse to Clarify Which Entity Has the Relevant Subpoenaed Documents.

Plaintiffs' February 23, 2018 subpoena directed to FIS sought targeted categories of documents and, more importantly, ATM data.  Specifically, Plaintiffs sought ATM transaction data including the ATM fees (ATM access fees, interchange fees, foreign ATM fees, switch fees, network fees, etc.) imposed on transactions processed by FIS, as well as identifying information for ATM acquirers and ATMs. *Id.* ¶ 9.   Other requests sought brochures and promotional materials, studies analyzing competition among ATM networks, policies, practices, and procedures of ATM networks, communications and contracts with ATM networks, policies concerning routing of ATM transactions, and schedules of ATM interchange fees.

In its March 26, 2018 Objections and Responses, FIS refused to produce documents or data on the grounds of undue burden, breadth, relevance, proportionality, and trade secrets and confidentiality. FIS also stated that, objections aside, it did not have documents responsive to nine out of ten subpoenaed requests.[7]

At the April 2, 2018 meet and confer, FIS counsel stated that FIS is merely a holding company that does not itself engage in ATM processing.   Although counsel asserted that

---

[6] Armed Forces Financial Network, *AFFN*, https://www.affn.org/ (viewed July 16, 2018).

[7]   *See* Briskin Decl. ¶ 10.   For request number 4, which called for studies and analyses concerning competition among ATM networks, FIS objected that the request "seeks highly confidential, competitive intelligence, trade secret information" and stated that it would not produce any documents.  *See id.* ¶ 11.

Plaintiffs had subpoenaed the wrong FIS entity, it refused to disclose to Plaintiffs which FIS entity had possession, custody or control of documents concerning FIS's processing operations. Briskin Decl. ¶ 16.  Multiple further efforts by Plaintiffs' counsel to obtain information on which entity to subpoena were ignored.

On May 3, 2018, Plaintiffs served a subpoena on a subsidiary of FIS called Fidelity Integrated Financial Solutions ("FIFS").  This was based on representations in FIS's 2018 10-K that FIFS was a "segment" of the company, and that FIFS "is focused primarily on serving . . . bank and saving institutions for transaction and account processing" and provides "Core Processing and Ancillary Applications," which "run banking processes for [FIS's] financial institution clients" and "serv[e] as the system of record for processed activity."  Briskin Decl. ¶ 19, 26-27.  FIFS, represented by the same counsel that represents FIS, also insisted that it did not have any responsive documents.  To date, counsel for FIS and FIFS have refused to clarify which related entity—if not FIS or FIFS—has custody and control over the requested data and documents.

**D.     Despite a Robust Protective Order, AFFN Has Stood On a "Trade Secret" Objection to Producing Data.**

AFFN, an ATM network that is partially co-owned by FIS, was subpoenaed by the parties for its ATM data in January and February 2018.  Briskin Decl. ¶ 6.  AFFN objected to the subpoenas on multiple grounds, including that the requests were vague, ambiguous, overly broad, unduly burdensome, oppressive, duplicative, or unreasonably cumulative.  *Id.* at 12.  It also asserted an overarching objection that the subpoenaed data would reveal trade secrets that might end up in the hands of employees at Defendants Visa or Mastercard, resulting in competitive injury to AFFN.  Among all the subpoenaed networks, only AFFN and FIS's wholly owned subsidiary NYCE have refused to produce any of the requested data on the basis of this

purported "trade secret" objection.[8]  In fact, Plaintiffs have had constructive negotiations with all other third-party networks and have received, or anticipate receiving, data-rich productions.  *See id.* ¶ 36.

Plaintiffs pursued good faith compromises throughout multiple rounds of telephonic and written meet-and-confers with AFFN.  *See id.* ¶¶ 14, 24, 16-30, 35. Plaintiffs first asked AFFN to explain why and how its data rises to the level of a trade secret.  AFFN has failed to provide any reasonable explanation or justification.  Plaintiffs also asked AFFN to specify the competitively sensitive aspects of its data so that Plaintiffs could evaluate whether the subpoena requests could be modified to eliminate sensitive data elements.  AFFN refused to engage in that discussion.  Further, Plaintiffs solicited AFFN for any additional provision to the Protective Order that might resolve AFFN's concerns.  AFFN offered no suggestions.  At an impasse, and with critical case deadlines fast approaching,[9] Plaintiffs have no option but to seek this Court's assistance.

## ARGUMENT

### A.     FIS's Game of "Hide the Ball" Violates the Civil Procedure Rules.

#### 1.     FIS's Insistence That It Does Not Maintain the Requested Data Is Contradicted by Its Public Statements.

Rule 45 of the Federal Rules of Civil Procedure expressly authorizes a party to issue a subpoena commanding the person to whom it is directed to attend and give testimony or to

---

[8]  Plaintiffs have recently filed a very similar motion to compel production of documents from NYCE, which objected and categorically refused to produce responsive data and documents based on a trade secret objection.  *See Mackmin et al. v. NYCE Payments Network, LLC*, Case No. 2:18-cv-11517 (D.N.J.).   On July 17, 2018, the court denied NYCE's motion for an extension of time to respond to the subpoena.  *Id.,* Dkt. No. 7.

[9]  Under the current schedule, class certification motions must be submitted by September 28, 2018 and, in reference to that deadline, Defendants committed to substantially complete their document and data productions by July 16, 2018.  *See Mackmin et al. v. Visa, Inc., et al.*, 11-cv-1831, Dkt. No. 140 at 4.

produce and permit inspection of designated records. Fed. R. Civ. P. 45. It is well settled that the scope of discovery under a Rule 45 subpoena is the same as that permitted under Rule 26. *See Barrington v. Mortgage IT, Inc.*, No. 07-61304-CIV, 2007 U.S. Dist. LEXIS 90555, at *8-9 (S.D. Fla. December 10, 2007).

"Discovery is not a game of 'blind man's bluff,' or 'hide the ball.'" *Parrish v. Freightliner, LLC*, 471 F. Supp. 2d 1262, 1270 (M.D. Fla. 2006) (internal citations omitted). This Court has stated, "[T]here is a rebuttable presumption that a . . . corporation is in possession and control of its own books and records." *Chambers v. Sygma Network, Inc*., Case No. 6:12-cv-1802, 2013 U.S. Dist. LEXIS 59318 at *9 (M.D. Fla. 2013) (quoting *In re Equitable Plan Co*., 185 F. Supp. 57, 59 (S.D.N.Y. 1960)). Despite Plaintiffs' efforts, including multiple telephonic conferences and written correspondence, FIS and FIFS insist that they possess no responsive documents, yet they have failed to explain their extensive public representations to the contrary. For example:

- FIS's website, which states that FIS offers "ATM driving, processing and monitoring services" to ATM networks;[10] *see* Briskin Decl. ¶ 18, 25, Ex. Y.

- A different section of FIS's website entitled "ATM Driving, Processing and Monitoring," which states that FIS "provides web-based tools that provide [its financial institution customers] with real-time access to [their] data" and "monitoring reports that detail event history, status code frequency and ATM availability";[11] *see* Briskin Decl. ¶ 18, 25 Ex. Y.

- FIS's 2017 annual report, which states that "the Company provides cash settlement services to financial institutions and state and local governments. These services involve the movement of funds between the various parties

---

[10] FIS, *ATM Processing & Solutions*, https://www.fisglobal.com/solutions/banking-and-wealth/consumer-banking/digital-and-channel/atm (viewed July 8, 2018).

[11] FIS, *ATM Driving, Processing and Monitoring*, https://www.fisglobal.com/solutions/Payment-Solutions/Digital-Payments#retailatm (viewed July 8, 2018).

associated with automated teller machines ("ATM"), point-of-sale or electronic benefit transactions ("EBT") …" *see* Briskin Decl. ¶ 19 Ex. P.

- FIS's 2017 annual report also states that FIS "serv[es] as the system of record for processed activity" for its clients; and, *see* Briskin Decl. ¶ 19.

- FIS's 2018 10-K, which indicates that the IFS "segment" of FIS provides "core processing and ancillary applications" including "run[ning] banking processes for our financial institution clients" and "serving as the system of record for processed activity." *see* Briskin Decl. ¶ 19 Ex O.

- In addition, Independent Sales Organization ("ISO") Payment Alliance International has identified FIS as an entity with whom it partners for "processing of ATM transactions." Briskin Decl. ¶ 38 Ex. BB.

FIS has attempted to obscure its role as an ATM processor by suggesting in its April 25, 2018 letter to Plaintiffs that FIS's representations about its role "in the ATM business" were made on behalf of its subsidiaries.  Briskin Decl. ¶ 21. Yet when Plaintiffs directed a subpoena at a specific subsidiary of FIS called Fidelity Integrated Financial Services (FIFS), FIFS also replied that it had no responsive documents. Like FIS, FIFS's contention that it controls no documents responsive to Plaintiffs requests is contradicted by FIS's 2018 10-K, which contains the following information about FIFS:

- "The IFS segment is focused primarily on serving North American regional and community bank and savings institutions for transaction and account processing . . ."

- FIFS's "core processing software applications are designed to run banking processes for [FIS] financial institution clients . . . serving as the system of record for processed activity."

*See* Briskin Decl. ¶ 19 Ex. O.

Although Plaintiffs have asked FIFS counsel to explain the discrepancy between FIFS' public representations and its apparent lack of responsive documents, FIFS has refused to do so. Briskin Decl. ¶¶ 16, 18, 20, 25.

2. **Even If FIS Does Not Maintain the Requested Documents, It Has an Obligation to Identify the Subsidiary that Is Able to Respond to the Subpoena.**

FIS cannot avoid its discovery obligations by requiring Plaintiffs to subpoena various corporate entities until they chance upon the correct one.  Plaintiffs have subpoenaed the parent corporation, FIS, which has control over the documents of any subsidiary ultimately holding records of ATM processing.  "Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand." *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). "Under this principle of broad construction, discovery can be sought from one corporation regarding materials that are in the physical possession of another, affiliated corporation." *Costa v. Kerzner Int'l Resorts, Inc.*, 277 F.R.D. 468, 471 n.1 (S.D. Fla. 2011). Where affiliated corporate entities are under common ownership, "courts have consistently held that 'control' exists." *Id.* at 472 (collecting cases); *see also In re Seergeeva*, 2013 U.S. Dist. LEXIS 200180 at *24 (N.D. Ga. 2013) (collecting cases) ("courts have found control by a parent corporation over documents held by its subsidiary, by a subsidiary corporation over documents held by its parent, and by one sister corporation over documents held by another sister corporation.").

Nor is FIS's assertion that it is a "non-operational holding company" sufficient to obviate its discovery obligations. Particularly instructive here is *Black Knight Fin. Servs. v. Powell*, Case No. 3:14-mc-42-J-39MCR, 2014 U.S. Dist. LEXIS 185008 *4-5 (M.D. Fla. 2014), where plaintiffs subpoenaed a loan servicing software provider, Black Knight Financial Services, seeking to learn how its servicing platform functions. Black Knight sought to quash the subpoena on the grounds that it was "merely a holding company," and thus not the correct entity for subpoena service. *Id.* at *4. The court denied the motion to quash the subpoena based on

Plaintiffs' representation that a customer of Black Knight had identified it as the party upon which the subpoena should be served. *Id.* at *5. Similarly here, FIS's corporate status as a holding company is insufficient to absolve it of the responsibility to produce documents.[12]

Therefore, FIS and FIFS should be compelled to produce the subpoenaed documents.

**B.      AFFN's Objections to the Subpoena Are Without Basis.**

**1.      AFFN's "Trade Secret" Objection is Meritless.**

AFFN's trade secret objection to producing the subpoenaed data fails on two fronts. First, AFFN has not made a threshold showing, as is required, that the requested data in fact constitutes, or would reveal, any trade secret.  *See Direct Purchaser Class Plaintiffs v. Apotex Corp.*, 2017 WL 4230124, at *2 (S.D. Fla. May 15, 2017) (citing *Centurion Industries, Inc. v. Warren Steurer and Assocs.*, 665 F.2d 323 (10th Cir. 1981)); *In re Pinchuk*, 2014 WL 1745047 (S.D. Fla. Apr. 30, 2014) (citing *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir.1985) ("the party resisting discovery bears the burden of proving the inadequacy of the subpoena.")); *R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 F. App'x 880, 882 (3d Cir. 2002) (stating that third-party has burden of establishing that subpoenaed material is trade secrets).  Far from it, AFFN has refused even to disclose the specific types of ATM data it maintains. Unsupported legal conclusions that subpoenaed information is confidential information and includes trade secrets—which is all AFFN has offered—are insufficient. *See Estate of Manship v. United States*, 240 F.R.D. 700, 702 (N.D. Ga. 2006) ("conclusory statements" are insufficient to establish a trade secret and quash a subpoena). Skepticism is particularly appropriate here

---

[12]     *See* Briskin Decl. ¶¶ 16, 21, 38.  For Request No. 4, which seeks studies and analyses concerning competition among ATM networks, FIS does not content that it lacks responsive documents, but rather maintains an objection on the basis that the documents sought are confidential and proprietary.  These meritless arguments fail for the same reasons discussed below with respect to the AFFN subpoena.

because Plaintiffs requested the same data from AFFN's rival networks, not one of which objected on the basis of trade secrets.

Second, even if AFFN had shown that the subpoenas seek trade secrets, production would be required because the controlling Protective Order fully addresses AFFN's competitive concerns. Specifically, the Protective Order includes a "Highly Confidential" designation precisely for any material that is "so competitively sensitive that it is entitled to extraordinary protections." Briskin Decl. ¶ 5 Ex. D. Those protections bar, among other things, disclosure of AFFN's "Highly Confidential" material to the employees (including in-house counsel) of any party, including Visa or Mastercard. *See* Ex. D ¶ 18.[13] In addition, the Protective Order squarely precludes any use of discovery materials outside the litigation and require destruction of protected materials once the litigation is resolved. *See id.* ¶¶ 15, 36.

These provisions are more than sufficient to compel production, as the district court in *Direct Purchaser Class Plaintiffs v. Apotex Corp.*, 2017 WL 4230124 held in an antitrust case directly on point. There, a third party opposed a subpoena on the ground that it sought purported trade secrets, including sales data. *Id.* at *2. The district court rejected the objection because production would be made under a protective order, and "[t]here is no reason to assume that the parties, through their lawyers, will not comply with this Court's order, or the Protective Order in the Antitrust Litigation." In reaching its conclusion, the district court restated observations from the Tenth Circuit when it affirmed a subpoena in another antitrust case: "'The claimed trade secrets do not relate to processes, formulas, or methods, but rather to price, cost, and volume of sales. . . . No absolute privilege protects the information sought here from disclosure in discovery proceedings.'" *Id.* at *5 (quoting *Covey Oil v. Continental Oil Co.*, 340 F.2d 993, 999 (10th Cir.

---

[13] Plaintiffs would not oppose AFFN designating its ATM data "Highly Confidential."

1965)).  The same applies to AFFN's transactional data, and courts across the country have taken the same approach, refusing to assume—as AFFN assumes here—that litigants will violate their obligations to safeguard discovery materials protected by court order.[14]

AFFN claims that there is "significant case law" to the contrary.  *See* Briskin Decl. ¶ 35. But AFFN has been unable to identify a single on-point decision from this Circuit in which a protective order barring disclosure to anyone but attorneys and others involved in the litigation process was deemed insufficient to protect trade secrets.  AFFN relies instead on cases that involve *party misconduct* or other unusual circumstances warranting heightened protections.[15] There is not even a whisper of that here.

---

[14]   *See, e.g.*, *R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 Fed. App'x 880, 882 (3d Cir. 2002) (affirming order requiring nonparty to provide subpoenaed information because it was covered by a protective order that "restricts the use of information gained from [the nonparty] to the pending antitrust and unfair trade practices litigation"); *Columbus Drywall & Insulation, Inc., v. Masco Corp.*, 2006 WL 2871834, at *1-2 (S.D. Ohio Aug. 7, 2006) (overruling third party's objection that a protective order that would prohibit disclosure of highly confidential to all but attorneys was inadequate to protect confidential trade secret information); *Cash Today of Texas, Inc. v. Greenberg*, 2002 WL 31414138, at *4 (D. Del. Oct. 23, 2002) (ordering disclosure of confidential information once it was covered by a protective order); *Gradillas Court Reporters, Inc. v. Cherry Bekaert, LLP*, 2018 WL 2197544, at *7 (N.D. Cal. May 14, 2018) (rejecting argument that protective order was insufficient to protect trade secrets because "the Court declines to assume that the attorneys will violate a court order, exposing themselves to contempt of court and sanctions"); *Alcoa, Inc. v. Universal Alloy Corp.*, 2016 WL 9175820, at *2 (N.D. Ga. Mar. 2, 2016) (rejecting as nothing "more than speculation" contention that "an expert would knowingly and willfully violate" terms of protective order); *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1026 (Fed. Cir. 1986) (holding that district court abused its discretion in denying discovery because nonparty had not "shown why a proper protective order would not adequately protect its trade secrets").

[15]   *Specialty Chemicals & Servs., Inc. v. Chandler*, 1988 WL 618583, at *7 (N.D. Ga. Sept. 29, 1988) ("It has been established to the Court's satisfaction that defendants stole plaintiff's formulas. Therefore, it would be fundamentally unfair to require plaintiff to turn over formulas, many of which plaintiff is unsure whether defendants know, and risk potential further disclosure of its formulas."); *Banner Indus. of N.E., Inc. v. Wicks*, 2013 WL 5722812, at *9 (N.D.N.Y. Oct. 21, 2013) (court persuaded that "primary inquiry" behind subpoenas was to gain competitive advantage and that developing evidence for the pending case was merely a "secondary aim"); *Grand River Enterprises Six Nations, Ltd. v. King*, 2009 WL 330213, at *5 (S.D.N.Y. Feb. 9,

*(continued . . . )*

15

## 2.     Although "Substantial Need" Is Not the Standard Here, Plaintiffs Have Shown a Substantial Need for AFFN's Data.

AFFN does not dispute that the subpoenaed data are relevant, nor could it.  *See* Briskin Decl. ¶¶ 3-4. Instead, it claims that Plaintiffs do not have a "substantial need" for the data.  The objection is unfounded.

To begin with, a showing of "substantial need"—rather than baseline relevance—is required *only* when the party resisting production has satisfied its "burden of proving that compliance with the subpoena involves . . . the disclosure of protected information." *Verizon Trademark Servs., LLC v. Producers, Inc*., No. 10-CV-665-T-33EAJ, 2011 WL 13176632, at *2 (M.D. Fla. Sept. 7, 2011); *see also* Fed. R. Civ. P. 45(d)(3)(C).  As shown above, AFFN has not carried that burden because "conclusory statements will not suffice." *Verizon Trademark Servs., LLC*, 2011 WL 13176632, at *2. Therefore, Plaintiffs do not need to demonstrate a substantial need for the subpoenaed data.

But even if Plaintiffs needed to show "substantial need," that is easily established here. There is no dispute that AFFN maintains data on class transactions that Plaintiffs intend to use for their class certification, liability and damages models.  AFFN's data would be particularly useful given that AFFN provides ATM services throughout the United States.[16]  Briskin Decl. ¶ 4.  Courts routinely compel the production of third-party data where, as here, it is likely to enhance the resolution of a model designed to demonstrate economic injury.  *See Direct*

---

*( . . . continued)*
2009) (requesting party's experts expressly refused to refrain from consulting the producing party's competitors); *In re Subpoena Duces Tecum Served on Bell Commc'ns Research, Inc.*, 1997 WL 16747, at *1 (S.D.N.Y. Jan. 17, 1997) (subpoena targeted forward-looking strategic business plans); *Insulate Am. v. Masco Corp.*, 227 F.R.D. 427, 434 (W.D.N.C. 2005) (party seeking discovery had *itself* questioned whether the particular protective order at issue "adequately protects confidential information").

[16] *See* Armed Forces Financial Network, *AFFN*, https://www.affn.org/ (viewed July 16, 2018).

*Purchaser Class Plaintiffs*, 2017 WL 4230124, at *3, *5 (compelling production of third-party sales data in antitrust case because it was "relevant and necessary" for "construct[ing] a model of what prices would have been charged [for relevant product] but for [the] alleged anti-competitive conduct."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2010 WL 11613859, at *4 (D.D.C. Sept. 9, 2010) (compelling production of third-party data so that the plaintiffs' "expert will have additional data to investigate the relationship between freight rates and variable costs").

AFFN offers no coherent argument that "substantial need" is absent here. Instead, AFFN argues that data related to its transactions should be pursued from the individual ATM operators who participate in the AFFN network. But AFFN serves ATM operators throughout the United States. *See* Briskin Dec. ¶ 4. Plaintiffs should not be required to subpoena numerous other entities to obtain data available from a single source. Indeed, if Plaintiffs had taken that approach, the ATM operators would have opposed production on the ground that AFFN was the "more convenient, less burdensome, or less expensive" source of the information. Fed. R. Civ. P. 26(b)(2)(C)(i).

AFFN also claims that there is no need for its data because it has already produced a few fee schedules. Not so. The fee schedules show only certain fees—so-called "interchange" fees—that AFFN imposed on transactions routed over its network. As Plaintiffs have explained above, however, these cases concern the relationship between interchange fees and ATM surcharges. *See* Briskin Decl. ¶¶ 3-4, 14, 15. The fee schedules AFFN has produced contain no information whatsoever on surcharges and, accordingly, are of little use standing alone. Even as to interchange fees, the schedules are deficient because AFFN's interchange rates differ by ATM

transaction type and AFFN has supplied no data on the mix of transactions passing through its network. *See id.* 13.[17]

### 3.    AFFN's Burden Arguments Are Disingenuous and Meritless.

AFFN elevated an additional objection late in the meet-and-confer process: the purportedly "undue burden" of producing the subpoenaed data.  The objection rings hollow given that, from the parties' first meet-and-confer, Plaintiffs expressed a willingness to narrow the subpoena requests based on the data AFFN maintains in reasonably accessible form.  AFFN refused to engage in that discussion.  *See* Briskin Decl. ¶ 29; *see also Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 562 F. Supp. 2d 606, 612 (D. Del. 2007) (sanctioning nonparty for, among other things, "[r]efusing to comply with [a] subpoena until it was narrowed, while at the same time refusing to provide either a data sample or a description of the data fields in question.")

In any event, AFFN has failed to substantiate its burden objection.  AFFN has not identified what responsive data it maintains, the form in which it exists, or the cost and effort involved in its retrieval.  Particularly because data can be harvested with automated tools, and need not be reviewed for responsiveness or privilege, AFFN cannot claim undue burden simply because a significant amount of data has been requested.  *See Nationwide Mut. Fire Ins. Co. v. Kelt, Inc.,* No. 14-CV-749-ORL-41, 2015 WL 1470971, at *3 (M.D. Fla. Mar. 31, 2015) ("'Parties are not permitted to assert these types of conclusory, boilerplate objections that fail to

---

[17]    For these reasons, AFFN's reliance on cases in which there was no material need for the subpoenaed material is misplaced. *See Rocky Mountain Med. Mgmt., LLC v. LHP Hosp. Grp., Inc.*, 2013 WL 6446704, at *6 (D. Idaho Dec. 9, 2013) (subpoenaed information was available from a party); *Litton Industries, Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 531 (E.D. Wis. Feb. 7, 1990) (court "not persuaded" that subpoenaed information was "essential to proof of damages"); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 138 F.R.D. 530, 536-39 (C.D. Ill. 1991) (questioning "need and the relevance" of the requested information).

explain the precise grounds that make the request objectionable.'") (citation omitted); *Chambers v. Sygma Network, Inc.*, No. 12-CV-1802-ORL-37, 2013 WL 1775046, at *3 (M.D. Fla. Apr. 25, 2013) (overruling objections to a subpoena because asserting a response that is "subject to" boilerplate objections "is improper and has been rejected by other courts in this District" because of the uncertainly it creates regarding whether the request has actually been answered).

Therefore, this Court should compel AFFN to produce the subpoenaed data.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request an Order compelling Fidelity National Information Services, Fidelity Integrated Financial Solutions, and Armed Forces Financial Network to produce documents and data response to Plaintiffs' subpoenas.

Respectfully submitted this 20th day of July, 2018.

**VARNELL & WARWICK, P.A.**

By: /s/ Janet R. Varnell_____
Janet R. Varnell, FBN: 0071072
Brian W. Warwick, FBN: 0605573
PO Box 1870
Lady Lake, Florida 32158
Telephone: (352) 758-8600
jvarnell@varnellandwarwick.com
bwarwick@varnellandwarwick.com
kstroly@varnellandwarwick.com

*Of Counsel:*

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Jennifer Fountain Connolly
(D.C. Bar No. 1019148)

HAGENS BERMAN SOBOL SHAPIRO LLP
1701 Pennsylvania Ave. NW, Suite 300
Washington, D.C. 20006
Telephone: (202) 248-5403
jenniferc@hbsslaw.com

Ben M. Harrington
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Heart Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3034
benh@hbsslaw.com

Stephen R. Neuwirth
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
stephenneuwirth@quinnemanuel.com

Adam B. Wolfson
Viola Trebicka
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
adamwolfson@quinnemanuel.com
violatrebicka@quinnemanuel.com

Craig L. Briskin
Joanna K. Wasik
MEHRI & SKALET, PLLC
1250 Connecticut Avenue, NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Cbriskin@findjustice.com
jwaisk@findjustice.com

***Counsel for Andrew Mackmin and Sam Osborn***

Douglas G. Thompson (D.C. Bar # 172387)
dthompson@finkelsteinthompson.com
Michael G. McLellan (D.C. Bar # 489217)
mmclellan@finkelsteinthompson.com

FINKELSTEIN THOMPSON LLP
1077 30th Street, NW, Suite 150
Washington, DC 20007
Telephone: 202-337-8000
Facsimile: 202-337-8090

Christopher Lovell
clovell@lshllp.com
Merrick Scott Rayle
mrayle@lshllp.com
LOVELL STEWART HALEBIAN JACOBSON LLP
61 Broadway Suite 501
New York, NY 10006
(212) 608-1900
Fax: (212) 719-4775

*Counsel for Mary Stoumbos*

Jonathan L. Rubin
MOGINRUBIN LLP
1615 M Street, NW, Third Floor
Washington, D.C. 20036
Tel: (202) 630-0616
Fax: (877) 247-8586
jrubin@moginrubin.com

Jennifer M. Oliver
MOGINRUBIN LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Tel: (619) 687-6611
Fax: (619) 687-6610
joliver@moginrubin.com

*Counsel for Plaintiffs the National ATM
Council, Inc.; ATMs of the South, Inc.;
Business Resource Group, Inc.;
Just ATMs USA, Inc.; Wash Water Solutions,
Inc.; ATM Bankcard Services, Inc.; Selman Telecommunications Investment Group, LLC;
Scot Garner d/b/a SJI; Turnkey ATM Solutions, LLC; Trinity Holdings Ltd, Inc.; and T&T
Communications, Inc. and Randal N. Bro d/b/a
T & B Investments*

## **CERTIFICATION OF ATTEMPT AT INFORMAL RESOLUTION**

Pursuant to Federal Rule of Civil Procedure 37(a)(1), Plaintiffs certify that, prior to filing this motion, they conferred in good faith with counsel for FIS, FIFS, and AFFN. *See* Briskin Decl. ¶¶ 14-35. Despite these efforts, Plaintiffs were unable to secure compliance with their subpoenas, and to resolve the differences between the parties.

Dated: July 20, 2018

By: /s/ Craig Briskin
Craig L. Briskin
cbriskin@findjustice.com
MEHRI & SKALET, PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, DC 20036
Telephone: 202-822-5100
Facsimile: 202-822-4997

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants, and that I served the foregoing by certified mail on Fidelity National Information Services, Inc., at 1200 South Pine Island Road, Plantation, FL 33324, and Armed Forces Financial Network, LLC at 11601 Roosevelt Blvd, TA-94, Saint Petersburg, FL 33716.

/s/      Janet R. Varnell
Janet R. Varnell, FBN: 0071072